MAINE SUPREME JUDICIAL COURT                           Reporter of Decisions
Decision:      2018 ME 65
Docket:        Pen-17-427
Submitted
  On Briefs:  April 25, 2018
Decided:       May 8, 2018

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

RICHARD T. MATTHEWS JR.

ALEXANDER, J.

[¶1]  Richard T. Matthews Jr., a mixed martial arts fighter who repeatedly punched the victim in the head, both before and after rendering him unconscious, appeals from a judgment of conviction entered by the trial court (Penobscot County, *Anderson, J.*) after a jury found him guilty of aggravated assault (Class B), 17-A M.R.S. § 208(1)(C) (2017).  He argues that there was insufficient evidence presented at trial upon which the jury could have found him guilty and found his self-defense claim disproven beyond a reasonable doubt.  We affirm the judgment.

I.  CASE HISTORY

[¶2]  When there is a challenge to the sufficiency of the evidence to support a jury's verdict, we must review the evidence in the light most

2

favorable to the State. *See State v. Hall*, 2017 ME 210, ¶ 29, 172 A.3d 467. On this record, the jury rationally could have found the following facts beyond a reasonable doubt.

[¶3]   On November 28, 2015, the fifty-six-year-old victim went to Seasons, a restaurant and lounge located in Bangor, to have a beer at the bar. The bartender observed that he "was quietly drinking" and that he "didn't talk a lot." Around the same time, forty-five-year-old Matthews and his wife entered Seasons to meet with some friends.

[¶4]  At some point in the evening, the victim moved closer to and made eye contact with persons in Matthews's party who were sitting at the bar approximately twelve to fifteen feet away. Matthews became upset and told the bartender that the victim was staring. The bartender told the victim that he had upset Matthews and suggested that he stop staring. Approximately five to six minutes later, at 9:52 p.m., the victim paid his tab and left. After leaving Seasons, the victim walked across the street to another bar known as the Pour House. He ordered a beer and went outside to smoke.

[¶5]  At 10:46 p.m., Matthews cashed out his tab at Seasons and went to the Pour House. After the victim finished smoking and went back inside, Matthews grabbed the victim and led him to the door where the bouncer was

standing.  The bouncer told Matthews to remove his hands from the victim and asked him what was happening.  Without providing a reason, Matthews told the bouncer that the victim needed to leave.  The victim denied that there was a problem and briefly waited near the bouncer before returning to the bar area.

[¶6]  A few minutes later, the bouncer saw the victim leave the Pour House and cross the street.  As the victim was crossing the street, Matthews went "running through the doors."  The bouncer tried to grab Matthews but lost his grip.  He saw Matthews run across the street, spin the victim around, and punch the victim in the face.  The bouncer testified that, when Matthews spun the victim around, the victim "didn't do anything."  Matthews continued to punch the victim in the face until he fell to the ground.  The bouncer observed Matthews sit on top of the victim and punch him in the face approximately ten times.  While observing Matthews attack the victim, the bouncer directed someone inside the bar to call 9-1-1.

[¶7]  A patron of the Pour House, who was walking back from a nearby parking lot, came upon Matthews punching the victim while on top of him.  From five or six feet away, she saw Matthews punch the victim in the face "over and over again," approximately eight to ten times.  She stated that the victim appeared to be unconscious because he was lying on the ground and he "wasn't

4

moving at all" and "wasn't defending himself." After the patron and the bouncer yelled at Matthews to stop, Matthews stood up and returned to the Pour House.

[¶8]  When officers of the Bangor Police Department arrived, the victim was still lying on the ground.  One of the responding officers who had known the victim since the officer was five years old did not recognize the victim due to his injuries.

[¶9]  The victim sustained numerous injuries and was transported to the emergency department at Eastern Maine Medical Center.  The treating physician observed that the victim had "a lot of facial trauma"—swelling around both eyes, bruising under both eyes, swelling and cuts around the lips and mouth, missing teeth—and that the victim had an "altered mental state," meaning that he was not aware of where he was or what had happened.[1]  A CAT scan revealed that the victim had suffered multiple nasal fractures; a fracture of the maxillary spine; and fractures of the orbital bones surrounding both eyes. The victim was diagnosed with a concussion.[2]  He did not have any injuries indicating that he had tried to defend himself.

---

[1] At the time of trial, the victim still had no memory of the assault.

[2] The victim's recovery lasted several months, including a week to remove the dirt and gravel from the back of his scalp, two weeks without being able to eat solid foods, three weeks for the bruising to fade, six weeks for the swelling to decrease, and a couple of months for the hair on the back of his head to grow back.  At the time of trial—fifteen months after the assault—the victim

[¶10]  The treating physician testified that the victim's injuries could have been more serious: the amount of force that was used to cause the facial trauma could have caused a fracture of the neck or cervical spine; the trauma to the victim's eyes could have caused his vision to be permanently impaired; and the trauma to his lips could have caused permanent disfigurement.

[¶11]  In January 2016, Matthews was charged by complaint with aggravated assault (Class B), 17-A M.R.S. § 208(1)(C), and was indicted two months later.  He pleaded not guilty.  The court held a two-day jury trial ending on March 1, 2017.

[¶12]  Matthews testified in his own defense.  He testified that he has been a mixed martial arts competitor for five or six years and that he is trained in how to "intelligently defend" himself, which includes dodging and blocking strikes.  His version of the events was that—before speaking to the bartender at Seasons—he asked the victim to stop staring at his wife and her friend because it was making them feel uncomfortable.  Matthews testified that the victim just laughed but later became "very aggressive" and told Matthews that he was not scared of him.  Matthews testified that he left Seasons and went to

---

continued to have dental issues.  The emergency department physician who treated the victim testified that the fractures that the victim sustained typically take four to six weeks to heal.

6

the Pour House because of the victim's behavior. He further testified, however, that as he was about to enter, he saw the victim walking toward the Pour House. Matthews stated that he considered leaving but decided to stay.

[¶13]  Matthews testified that, after the victim returned from smoking, he saw the victim reach out "like he was gonna grab my wife's rear end," which was his reason for grabbing onto the victim and escorting him to the door. Matthews further testified that the victim bumped him with his shoulder and stated, "You're not always going to be around," before leaving the Pour House.

[¶14]  Matthews stated that he was concerned and confused by the victim's statement, so he followed the victim out of the Pour House to ask him what he had meant. Matthews stated that he "hollered" at the victim from across the street, but the victim did not turn around. Matthews testified that when he caught up to the victim and hollered at him again, the victim partially turned and swung at him "like he was gonna throw an elbow" or "a spinning back fist."

[¶15]  Matthews testified that he punched the victim in the face three or four times because he thought that the victim was going to hurt him. He further admitted to getting into a "side mount position" and punching the victim an additional four or five times after the victim had fallen to the ground "to make

sure he stayed down." Matthews believed that the victim was conscious when he hit the ground "[b]ecause his arms were still up."

[¶16] The jury found Matthews guilty. Matthews was sentenced to four years' imprisonment with all but eighteen months suspended and two years' probation. He timely appealed.

## II. LEGAL ANALYSIS

[¶17] Matthews argues that the State presented insufficient evidence to prove that he manifested an extreme indifference to the value of human life and to disprove his self-defense justification beyond a reasonable doubt. We view the evidence in the light most favorable to the jury's verdict to determine whether the jury could have rationally found, beyond a reasonable doubt, that Matthews committed each element of the offense of which he was convicted and that he did not act in self-defense. *See Hall*, 2017 ME 210, ¶ 29, 172 A.3d 467; *State v. Fletcher*, 2015 ME 114, ¶ 12, 122 A.3d 966.

A. Manifestation of an Extreme Indifference to the Value of Human Life

[¶18] Aggravated assault, as alleged against Matthews, is proved by evidence that he "intentionally, knowingly or recklessly cause[d] . . . [b]odily injury to another under circumstances manifesting an extreme indifference to the value of human life." 17-A M.R.S. § 208(1)(C). Section 208(1)(C) provides

8

that "[s]uch circumstances include, but are not limited to, the number, location or nature of the injuries, the manner or method inflicted, [and] the observable physical condition of the victim." We have interpreted the "extreme indifference" element to mean that death or serious bodily injury was reasonably likely to result from the defendant's conduct under the circumstances. *State v. Dodd*, 503 A.2d 1302, 1304-06 (Me. 1986). Matthews does not challenge the sufficiency of the evidence of the mens rea or bodily injury elements.

[¶19] Contrary to Matthews's contention, there is sufficient record evidence to support the extreme indifference element—namely, the testimony of the victim and the treating physician regarding the numerous fractures and other injuries to the victim's head and face; the treating physician's testimony that the injuries could have been more serious, including permanent impairment, given the amount of force that was used on the victim; and the bouncer's and patron's testimony that Matthews repeatedly struck the victim after the victim had fallen to the ground and appeared to be unconscious. *See State v. Cunningham*, 1998 ME 167, ¶¶ 2-4, 715 A.2d 156; *State v. Porter*, 1997 ME 74, ¶¶ 6-7, 693 A.2d 743; *Dodd*, 503 A.2d at 1304-06.

B.      Self-Defense

[¶20]  Title 17-A M.R.S. § 108(1) (2017) establishes a justification for the use of nondeadly force in self-defense.  "A defendant's use of nondeadly force is justified when: (1) the defendant has an actual belief that imminent and unlawful nondeadly force is about to be used against him or a third person; (2) that belief is objectively reasonable; (3) the defendant has an actual belief that force is necessary to defend himself or the third person; (4) that belief is also objectively reasonable; (5) the defendant uses only a 'reasonable degree of nondeadly force' to repel the attack; (6) the defendant did not provoke the other person's use of force; (7) the defendant was not the 'initial aggressor' or, if he was, he 'withdraws from the encounter and effectively communicates to such other person the intent to do so'; [and] (8) the force is not 'the product of a combat by agreement not authorized by law[.]'"  *State v. Ouellette*, 2012 ME 11, ¶ 11, 37 A.3d 921 (quoting 17-A M.R.S. § 108(1)).  "If the jury finds that the State disproved at least one element of self-defense, the jury may then convict the defendant if it also finds, beyond a reasonable doubt, that the defendant committed each element of the crime." *Ouellette*, 2012 ME 11, ¶ 17, 37 A.3d 921.

[¶21] Here, Matthews testified that he is skilled in mixed martial arts and trained to "intelligently defend" himself. After the victim left the Pour House and crossed the street, however, Matthews "hollered" at the victim, pursued the victim by running after him, and then attacked the victim after the victim turned toward Matthews and, according to Matthews, swung at him.

[¶22] There is ample record evidence supporting a finding that the State disproved self-defense. The jury could have rationally found either that Matthews did not actually believe that the victim was about to use unlawful force against him—or that such a belief was not objectively reasonable—based on the bouncer's testimony that Matthews pursued the victim, spun the victim around and punched him, and that the victim "didn't do anything." The jury also could have found either that Matthews did not subjectively believe that force was necessary—or that his belief was unreasonable—based on Matthews's testimony that he was skilled in mixed martial arts and could have defended himself by blocking or dodging but reacted offensively instead.

[¶23] The jury could have rationally found that Matthews was the initial aggressor. There was evidence that the victim left both establishments after confrontational encounters with Matthews and that Matthews pursued the victim as he was walking away. The jury also could have found that Matthews

used an unreasonable degree of force. The bouncer and the patron who witnessed the assault estimated that Matthews punched the unconscious victim eight to ten times, and the treating physician stated that there was no physical evidence that the victim had tried to defend himself. By Matthews's own testimony, he struck the victim several times after the victim had fallen to the ground—not to defend himself, but to make sure that the victim stayed down. *See Fletcher*, 2015 ME 114, ¶¶ 14-15, 122 A.3d 966; *State v. Lagasse*, 410 A.2d 537, 542-43 (Me. 1980).

The entry is:

Judgment affirmed.

---

Richard L. Hartley, Esq., Law Office of Richard L. Hartley, P.C., Bangor, for appellant Richard T. Matthews

R. Christopher Almy, District Attorney, Mark A. Rucci, Asst. Dist. Atty., and Katelynn Ronan, Stud. Atty., Prosecutorial District V, Bangor, for appellee State of Maine

Penobscot County Unified Criminal Docket docket number CR-2015-4464
FOR CLERK REFERENCE ONLY